UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:25cv-85-RGJ
*Electronically Filed*

TIFFANY ALMEYDA
and
KENNETH FELT JR. PLAINTIFFS

v.

WOOSTER MOTOR WAYS, INC.
and
RICHARD PIPER DEFENDANTS

---

**DEFENDANT WOOSTER'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

## INTRODUCTION

This action concerns a man who made terrible choices unrelated to his employment. Defendant Richard Piper ("Piper"), for whatever personal reasons, chose to consume alcohol to the point of severe intoxication while operating a commercial motor vehicle owned by Wooster Motor Ways. He did so despite knowing it was a crime. He did so despite knowing it was a direct violation of the Federal Motor Carrier Safety Act's ("FMCSA") zero-tolerance alcohol policy. He did so despite knowing it was a direct violation of Wooster's zero-tolerance policy. He did so despite knowing it disqualified him from commercial driving. He did so despite knowing he could kill someone.

Nevertheless, Piper became severely intoxicated while driving Wooster's tractor-trailer, and his choices resulted in the death of Colton Tanner and injuries to the Plaintiffs herein. He embarked on a deliberate, intentional, criminal course of conduct which did not advance Wooster's interests. It was beyond Wooster's control.

As a result of this accident, the U.S. Department of Transportation ("USDOT") conducted an audit of Wooster's safety protocols and procedures with respect to its drivers and vehicle maintenance. That audit found no violations or breakdowns in processes on Wooster's part with respect to this accident and overall corporate safety. The auditor commended Wooster's practices and lamented Piper's poor choices. For this tragic accident, Plaintiffs Almeyda and Felt seek to hold Wooster vicariously liable for Piper's conduct and further assert claims of negligence *per se* and negligent hiring, training, supervision, retention, and entrustment, and urge that punitive damages are appropriate. For all reasons discussed herein, Defendant Wooster respectfully moves for entry of summary judgment on all counts.

## FACTUAL BACKGROUND

### I. Piper's Hiring and Tenure of Employment with Wooster Motor Ways.

To frame the issues for which Wooster now seeks Summary Judgment, it is instructive to consider the issues within the context of the Federal Motor Carrier Safety Act ("FMCSA") and the USDOT's audit of this accident. The parties' experts, Mr. Ted Matthews and Mr. Larry Miller, mutually agree that the FMCSA is "the foundation for the commercial transportation industry."[1] Audits are required when a motor carrier is involved in a fatal accident.[2] The auditor reviewed Wooster's driver qualification and personnel files, to include all hiring screenings and processes, for Piper and other exemplar drivers. The auditor also examined Wooster's random drug and alcohol testing program, maintenance files for the subject tractor-trailer, and Wooster's DOT

---

[1] Deposition of Ted Matthews, Sept. 24, 2026, p. 16-17. Wooster previously filed Messrs. Matthews and Miller's deposition transcripts as Exh. C and D, respectively, of Defendant Wooster's Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment; for the convenience of the Court, Wooster relevant excerpts of Messrs. Matthews and Miller's deposition, attached hereto as Exh. A and B respectively; *see also* Expert Report of Larry Miller, attached hereto as Exh. C.

[2] Dep. of Ted Matthews at p. 30-31; *see also* Expert Report of Larry Miller at p. 5.

filings. The auditor then issued a formal report finding no violations nor any breakdowns in processes concerning Piper and this accident.[3] When issuing the report, the DOT auditor advised:

> You are doing a good job and I have no feedback besides keep doing what you are doing. I wish all my other companies were doing as good of a job as you guys are. There are no violations on the report. It is an unfortunate circumstance that Mr. Piper made poor choices in life that resulted in the tragic death[]. I hope Mr. Piper finds peace in this life or the next as he will have to live with the consequences of his actions until his death. A sad situation for everyone.[4]

Of the documents the auditor reviewed, they included Piper's Application for Employment submitted on April 4, 2023.[5] Wooster extended a conditional offer of employment on the same day.[6] Piper's employment application included executed authorizations allowing Wooster to investigate Piper's personal, employment, financial, and/or medical history.

In compliance with FMCSA regulations, Wooster's investigated Piper's prior employers, conducted through a "reputable" third-party vendor/database.[7] All employers for whom Piper provided driving services reported Piper to be a "satisfactory employee."[8] None of the prior employers reported that Piper had any DOT reportable accidents in the seven years prior, nor did any report any incident involving drugs or alcohol.[9]

When vetting prospective drivers, the FMCSA requires motor carriers to submit a query to the Drug and Alcohol Clearinghouse, a "new federal program" requiring motor carriers and/or testing agencies to report positive drug and alcohol tests to the DOT.[10] Wooster's Clearinghouse query on Piper identified no open violations, and Wooster was authorized to rely on this report.[11]

---

[3] *See* USDOT Compliance Audit Report, attached hereto as Exh. D.
[4] *See* USDOT Auditor Email, dated October 18, 2026, attached hereto as Exh. E
[5] *See* Piper Application for Employment, attached hereto as Exh. F.
[6] *See* Conditional Offer of Employment Letter, attached hereto as Exh. G.
[7] Dep. of Ted Matthews at p. 39; *see also* Dep. of Larry Miller at p. 135-137.
[8] Dep. of Ted Matthews at p. 41-42; *see also* Dep. of Larry Miller at p. 136-137. The one exception, Baylor Trucking, reported only that Piper "quit / dismissed during training and/or probation." *See* Dep. of Ted Matthews at p. 42; *see also* Dep. of Larry Miller at p. 137-138.
[9] Dep. of Ted Matthews at p. 44-45, and 50-51; *see also* Dep. of Larry Miller at p. 136-138.
[10] Dep. of Ted Matthews at p. 66-67.
[11] Dep. of Ted Matthews at p. 68; *see also* Dep. of Larry Miller at p. 138.

The FMCSA further requires prospective drivers and existing drivers to undergo medical evaluations to certify fitness to operate commercial motor vehicles.[12] These examinations are performed by registered medical providers, who evaluate a range of conditions, to include clinical alcoholism.[13] It further empowers the medical examiners to pursue additional follow-up assessments if they have concerns which cannot be resolved during the examination.[14] Motor carriers, such as Wooster, are entitled to rely upon these medical certifications at "face value."[15]At the time of his application, Piper held a medical certification valid until May 2024.[16] He submitted to another medical examination in May 2024 In neither instance did the medical examiners report any concern about alcoholism or any other disqualifying medical condition.[17] Wooster was entitled to rely upon these examinations.[18]

Wooster also complied with the FMCSA as to drug and alcohol testing. The FMCSA imposes a zero-tolerance standard for drugs and alcohol while a driver is on duty.[19] Violations thereof are a disqualifying event, *i.e.*, the motor carrier cannot allow the driver to operate any commercial motor vehicle.[20] Disqualification does not require criminal charges or conviction, only "driving a commercial motor vehicle while under the influence of alcohol."[21]

The FMCSA requires six types of drug and alcohol testing, for this audit, the USDOT focused on: pre-employment, random, and reasonable suspicion.[22] Piper's pre-employment drug

[12] 49 C.F.R. §391.41(b).
[13] 49 C.F.R. §391.41(b)(13).
[14] 49 C.F.R. Part 391 Appendix A, Subsection K, Medical Advisory Criteria for 49 C.F.R. § 391.41(b)(13).
[15] Dep. of Ted Matthews at p. 62; Dep. of Larry Miller at p. 138-139.
[16] *See* May 2022 and May 2024 Medical Examination Certificates, attached hereto as Exh. H.
[17] *Id*.
[18] Dep. of Ted Matthews at pp. 57-60; Dep. of Larry Miller at p. 143.
[19] 49 C.F.R. §391.15(c)(2)(i).
[20] Dep. of Ted Matthews at p. 104; Dep. of Larry Miller at p. 187.
[21] 49 C.F.R. §391.15(c)(2)(i).
[22] The other instances of drug and alcohol testing include post-accident testing under certain circumstances, as well as return-to-duty and follow-up testing where there was a prior drug or alcohol violation. 49 C.F.R. §§382.301 – 382.311; *see also* Dep. of Ted Matthews at p. 70-71; *see also* Expert Report of Larry Miller at p. 5-6.

and alcohol test was clear.[23] First, for the random testing, motor carriers are required to test 25% of its driver pool for drugs and 5% of its pool for alcohol.[24] Wooster's random testing is administered by a third-party vendor, as is common among smaller motor carriers.[25] Wooster provides a complete list of its driver to the vendor, and the vendor randomly selects the drivers to be tested. Wooster has no ability to influence which drivers are selected.[26] During his tenure of employment, Piper was never selected for under the third-vendor's system. Second, the record is devoid of any evidence suggesting Wooster ever had cause to reasonably suspect Piper reported to duty or otherwise operated tractor-trailers while under the influence of drugs or alcohol prior to the subject accident. [27]

Wooster further provided Piper with its Drug and Alcohol Policy and its Drug Free Workplace Program Policy, for which he signed acknowledging his receipt and understanding of the policies.[28] Mr. Matthews testified that it was important for Piper to understand the federal regulations and Wooster's policies as to drugs and alcohol, and he further conceded Piper's acknowledgement and understanding of these policies.[29]

He did not find "any flaws" in Wooster's hiring processes for Piper,[30] and he agreed that Wooster's hiring processes with respect to Piper were compliant with the FMCSA.[31] Mr. Matthews further agreed that Wooster was "compliant in every respect with the FMCSA as it pertains to" Piper and the subject accident.[32] He agreed that there was "nothing in [Piper's] file that … would

---

[23] *See* Pre-Employment Drug and Alcohol Test, attached hereto as Exh. I.
[24] Dep. of Ted Matthews at p. 70.
[25] Dep. of Ted Matthews at p. 71-72; Dep. of Larry Miller at p. 140.
[26] Dep. of Ted Matthews at p. 72; Dep. of Larry Miller at pp. 142-143.
[27] Dep. of Ted Matthews at p. 74; Dep. of Larry Miller at pp. 215-216.
[28] *See* Drug and Alcohol Policy Acknowledgment of Receipt, attached hereto as Exh. J.; *see also* Drug Free Workplace Program Policy Acknowledgment of Receipt, attached hereto as Exh. K.
[29] Dep. of Ted Matthews at p. 54.
[30] Dep. of Ted Matthews at p. 46.
[31] Dep. of Ted Matthews at p. 53.
[32] Dep. of Ted Matthews at p. 92; Dep. of Larry Miller at p. 132.

be an indicator that [he] would drive while intoxicated," and he concurred that there was nothing about Piper's consumption of alcohol while driving the Wooster truck that advanced the interests of the company.[33]

> **Ms. Norris:** **[I]s there anything about drinking and driving while you are a commercial motor vehicle driver that advances the interests of the company?**
>
> **Mr. Matthews:** **No.[34]**

In sum, the USDOT auditor found Wooster was fully compliant with the FMCSA in all aspects with respect to Piper's employment while with the company, and nothing about Wooster's employment practices or supervision contributed to this accident. Wooster's expert, Mr. Larry Miller, concurs with the auditor's conclusion.[35] Mr. Matthews could not identify any instance in which Wooster violated FMCSA regulations with respect to Piper and this accident.[36] He further stated there was nothing to indicate Piper would drink and drive.[37] Further, both Messrs. Matthews and Miller agree that Piper operating a commercial motor vehicle under the influence of alcohol did not advance Wooster's interests, nor was there any basis for Wooster to know or anticipate his conduct.[38]

## II. <u>The Accident and Piper's Criminal Proceedings</u>.

The subject accident occurred on August 12, 2024, at approximately 4:34 p.m., along I-64 Eastbound in Louisville, Kentucky.[39] There was traffic congestion due to construction. As he approached, Piper failed to slow for traffic and struck Colton Tanner's vehicle, resulting in Mr.

---

[33] Dep. of Ted Matthews at p. 105.

[34] Dep. of Ted Matthews at p. 104; Dep. of Larry Miller at p. 186 (concurring with Mr. Miller that driving under the influence of alcohol does not advance Wooster's interests).

[35] *See* Expert Report of Larry Miller at p. 4.

[36] Dep. of Ted Matthews at p. 82.

[37] Dep. of Ted Matthews at p. 105.

[38] Dep. of Ted Matthews at p. 104; Dep. of Larry Miller at p. 186.

[39] Kentucky Uniform Traffic Collision Police Report at p. 1, attached hereto as Exh. L.

Tanner's death. The force of the impact caused Mr. Tanner's vehicle to collide with Plaintiffs' vehicle.

Louisville Metro Police Department ("LMPD") responded to the scene. Officers spoke with Piper as they investigated the accident. The lead detective eventually requested Piper's consent for a blood-alcohol test, to which Piper consented. Officers transported Piper to Louisville Metro Corrections to administer the blood-alcohol test. Approximately two hours passed between the accident and the blood-alcohol test, during which time Piper's body partially metabolized the alcohol in his system.[40]

Kentucky State Police Forensic Laboratories received the blood sample on August 21, 2024, and completed its analysis on September 9th.[41] The forensic examination calculated Piper's blood-alcohol content ("BAC") to be 0.204g/100mL.[42] Given metabolization between the accident and the blood draw, Wooster's forensic toxicology expert, Dr. Jortani, calculated Piper's BAC was 0.25g/100mL at the time of the accident.[43] Dr. Jortani described this BAC as "severe intoxicat[ion] … render[ing] [Piper] incapable of safe driving."[44] At this level of intoxication, Piper suffered loss of critical judgment, impaired memory and comprehension, and confusion.[45] At his deposition, the undersigned presented Mr. Matthews with Dr. Jortani's expert report, which he had not previously reviewed.[46] Mr. Matthews testified that he had no reason to dispute Dr. Jortani's opinions, and that intoxication is a "logical explanation" for Piper's erratic driving.[47] He further testified:

---

[40] *See* Expert Report of Dr. Saeed Jortani at p. 1, previously filed as Exh. A of Defendant Wooster's Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment.

[41] Kentucky State Police Forensic Laboratories Report of Laboratory Examination, previously filed as Exh. B of Defendant Wooster's Response in Opposition to Plaintiffs' Motion for Summary Judgment.

[42] *Id.*

[43] *See* Expert Report of Dr. Jortani at p. 1.

[44] *Id.* at p. 2.

[45] *Id.* at p. 1.

[46] Dep. of Ted Matthews at p. 21-22.

[47] Dep. of Ted Matthews at p. 22-23.

| | |
|---|---|
| **Ms. Norris:** | **… I think we agreed that this accident was caused by Mr. Piper's intoxication; is that correct?** |
| **Mr. Matthews:** | **That would be correct.** |
| **Ms. Norris:** | **And you have a long discussion in your report about speeding and hard braking events, Mr. Matthews?** |
| **Mr. Matthews:** | **Yes, ma'am.** |
| **Ms. Norris:** | **But we can agree, I think here today, that this accident was not caused by speeding or hard braking; is that correct?** |
| **Mr. Matthews:** | **There was no evidence of speeding or hard braking events in this crash.[48]** |

Upon the Kentucky State Police forensic report, the Commonwealth Attorney's Office impaneled a grand jury. On September 18th, the grand jury returned an indictment against Piper on the following charges: Murder, Assault in the 2nd Degree, Assault in the 4th Degree, five counts of Wanton Endangerment, Reckless Driving, Operating a Motor Vehicle Under the Influence of Alcohol under Aggravating Circumstances, and Criminal Violation of the Federal Motor Carrier Safety Administration Regulations.[49] The Jefferson County Circuit Court, Division Eleven, held a jury trial in the criminal matter from September 1st – 8th, 2026.[50] The Circuit Court entered a directed verdict on the count of Assault in the 2nd Degree. The remaining charges were submitted to the jury. On September 15th, the jury returned a verdict finding Piper guilty of all charges except Assault in the 2nd Degree, upon which the Circuit Court granted a directed verdict.[51] After a sentencing hearing, trial court imposed a sentence of twenty (20) years on October 16th.[52]

---

[48] Dep. of Ted Matthews at p. 114-115.

[49] *See Commonwealth v. Piper*, Jefferson Circuit, 24-CR-002098.

[50] *See* Amended Judgment of Conviction and Sentence After Jury Verdict, previously filed as Exh. E of Defendant Wooster's Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment.

[51] *Id*.

[52] *Id*.

# RULE OF LAW

Federal courts sitting in diversity apply the standards of Federal Rule of Civil Procedure 56 rather than Kentucky's summary judgment standard, as well as federal evidentiary standards.[53] However, the Kentucky Federal Court sitting in diversity applies Kentucky substantive law.[54] FRCP 56(c) provides that summary judgment is proper if the pleadings, depositions, discovery responses, admissions on file, and affidavits, if any, show that there is no genuine issue as to any material fact.

Here, Defendant Wooster has "the initial burden of proving that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law."[55] When these Defendants, as here, have "carried [their] burden under Rule 56(c), *its opponent must do more than simply show that there is* ***some metaphysical doubt as to the material facts***."[56] Rule 56(e) provides that Plaintiffs herein cannot "rest upon the mere allegations or denials of his pleading, but … must set forth specific facts showing that there is a genuine issue for trial."[57] The nonmoving party must present "**significant probative evidence**" sufficient "to require a jury or judge to resolve the parties' differing versions of truth at trial."[58] "A fact's materiality is determined by the substantive law, and a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party."[59] "A scintilla of evidence is insufficient to support plaintiff's position."[60]

The Sixth Circuit "has concluded that, in the new era of summary judgments that has

---

[53] *Hayes v. Equitable Energy Resources Co.*, 266 F.3d 560, 566 (6th Cir. 2001) (internal citation omitted).
[54] *Id.* (internal citations omitted).
[55] *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995) (internal citations omitted).
[56] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal citations omitted).
[57] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (internal citations and quotations omitted).
[58] *Id.* (emphasis added).
[59] *Id.* at p. 249.
[60] *Cox*, 53 F.3d at 150 (internal citations and quotations omitted).

evolved from the teachings of the Supreme Court in *Anderson*, *Celotex*, and *Matsushita*, trial courts have been afforded considerably more discretion in evaluating the weight of the nonmoving party's evidence."[61] When the record 'is taken in its entirety [and] could not convince a rationale trier of fact to return a verdict in favor of the nonmoving party, the motion should be granted."[62]

## ARGUMENT

### I. Count I of Plaintiffs' Complaint as to Vicarious Liability Fails as Piper Criminal Actions Were Far Beyond the Course and Scope of His Employment.

The doctrine of respondeat superior "run[s] deep in the common law."[63] It is underpinned by several concurrent rationales. It is not a deep pocket doctrine "especially since [it] evolved during a period in which the common law was not noted for its sympathy toward accident victims."[64] There "has to be more" to the doctrine of respondeat superior.[65] The imputation of liability to the employer is "the greatest incentive to be careful in the selection, instruction and supervision of [employees], and to take every precaution to see that the enterprise is conducted safely."[66] The employer is incentivized to not only encourage the exercise of ordinary care but also discourage the "overzealous pursuit of the employer's goals[.]"[67] Further, "where the conduct of the servant is unprovoked, highly unusual, and quite outrageous, there has been something of a tendency to find that this in itself is sufficient to indicate that the motive was purely a personal one, but it seems clear that this cannot hold true in all cases."[68]

---

[61] *Id.* at 150 (internal citations and quotations omitted).

[62] *Id.* (internal citations omitted).

[63] *Patterson v. Blair*, 172 S.W.3d 361, 363 (citing 1 William Blackstone, *Commentaries on the Law of England* 429 (1765)).

[64] *Id.*at 364 (finding the "deep-pocket" argument to be "an unsatisfactory, or at least an incomplete, explanation[.]").

[65] *Id*

[66] *Id.* at 365 (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* 500 (5th ed. 1984)); *see also American Gen. Life & Accident Ins. Co. v. Hall*, 74 S.W.3d 688, 692 (Ky. 2002) (The doctrines "plac[es] on employers an incentive to hire only careful employees.").

[67] *Id. at 366 (*citing Landes and Posner at 208-09); *see also* R.3d of Agency, §7.07, cmt. c.

[68] *Id.* (citing Prosser and Keeton at 506).

For nearly seventy years, Kentucky state courts have relied upon and adopted the Restatements of Agency.[69] The Second Restatement provided that criminal acts must be considered "since the master is not responsible for acts which are clearly inappropriate to or unforeseeable in the accomplishment of the authorized result."[70] The Third Restatement similarly provides that criminal conduct must be considered as "intentionally criminal conduct may indicate a departure from conduct within the scope of employment, not a simple escalation."[71] The Restatement also holds that "[t]he nature and magnitude of the conduct are relevant to determining the employee's intention at the time. … Matters of degree are also relevant to this determination."[72]

In 2005, the Kentucky Supreme Court approvingly cited the Draft Restatement (Third) of Agency §7.07 in *Patterson*,[73] and the Court formally adopted the published Restatement in 2008.[74] That section of the Third Restatement provides:

> (1) An employer is subject to vicarious liability for a tort committed by its employee acting within the scope of employment.
> (2) An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. **An employee's act is *not within* the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer**.

In adopting the Third Restatement, the *Patterson* Court rejected assessments of foreseeability.[75]

While some jurisdictions consider whether an employee was engaged in a "frolic or detour," Kentucky does not.[76] Similarly, examining vicarious liability under Kentucky law, the

[69] *See Bingham v. Commercial Credit Corp.*, 330 S.W.2d 427 (Ky. Ct. App. 1959) (citing R.2d of Agency §231 cmt. a, published in 1958).
[70] R.2d of Agency, §231, cmt. a.
[71] R.2d of Agency, §7.07, cmt. c.
[72] R.3d of Agency §7.07, cmt. c.
[73] *Patterson*, 172 S.W.3d at 370-71.
[74] *Papa John's Int'l, Inc. v. McCoy*, 244 S.W.3d 44, 51-52 (Ky. 2008).
[75] *Patterson*, S.W.3d at 369.
[76] Kentucky Personal Injury §10.04 (2026) (citing *Cincinnati Ins. Co. v. Hofmeister*, Nos. 2004-CA-002296-MR and 2004-CA-002362-MR, 2008 Ky. App. LEXIS 313, at *80 (Ky. Ct. App. Oct. 17, 2008) (Unpub.)).

Sixth Circuit previously articulated a four-part test, to include a factor examining "the authorized special and temporal limits of employment,"[77] but it later recognized the four-part test did not align with Kentucky jurisprudence.[78] Stated different, Kentucky courts do not apply vicarious liability simply because employment provides the opportunity for and instrumentality of the tortious conduct at issue. Rather, Kentucky courts look to whether "the conduct [is] of the **same general nature** as that authorized or **incidental** to the conduct authorized."[79]

As articulated in Wooster's Response in Opposition to Plaintiffs' Motion for Summary Judgment on vicarious liability, *Wood* is the seminal case on vicarious liability. In *Wood*, the tortious conduct was road rage. A bus driver forced another motorist off the road, followed the motorist for a fourth of a mile until the motorist pulled over, and then the bus proceeded to assault the motorist.[80] Kentucky's then-highest court that recognized the doctrine of vicarious liability was not applicable where an employee's conduct is personal even if "the wrongful act had its origin in some agency relation."[81] It further remarked that where an employee acts "beyond the scope of his employment, the [employee] is as much a stranger to his [employer] as any third person[.]"[82] Finding the bus driver's conduct "bore no similarity" to his usual employment duties, the *Wood* Court refused to hold the employer vicariously liable.[83]

In *Osborne*, a married couple sought marriage counseling from their parish priest.[84] The wife and priest embarked on an adulterous relationship, and the husband alleged intentional

---

[77] *Coleman v. United States*, 91 F.3d 820, 824 (6th Cir. 1996) (internal citations omitted).

[78] *See Wood v. Southeastern Greyhound Lines*, 302 Ky. 110, 194 S.W.2d 81, 83 (Ky. Ct. App. 1946); *see also Scottsdale Ins. Co. v. Nat H. Sandler*, 381 Fed. Appx. 554 (6th Cir. 2010) (noting Kentucky courts articulate vicarious liability standards different from the *Coleman* four-part test).

[79] *Osborne v. Payne*, 31 S.W.3d 911, 915 (Ky. 2000) (citing *Wood*, 194 S.W.2d at 114) (emphasis added); *see also* Kentucky Personal Injury §10.04 (2026).

[80] *Wood*, 194 S.W.2d at 82.

[81] *Id.* (collecting cases).

[82] *Id.*

[83] *Wood*, 194 S.W.2d at 83-84.

[84] *Osborne*, 31 S.W.3d at 913.

infliction of emotional distress against the priest for which he sought to hold the Diocese vicariously liable.[85]

> [Husband] reasons that the diocese should be vicariously liable for the actions of Osborne. We cannot agree. **To accept such a theory would in effect require the diocese to become an absolute insurer** for the behavior of anyone who was in the priesthood and would result in strict liability on the part of the diocese for any actionable wrong involving a parishioner. We must conclude that such an argument is absurd. Certainly, the scope of employment of a priest would include marriage counseling, but it clearly does not include adultery.
>
> … In this situation, it is the abuse by the priest of his position that exceeds the scope of his employment. **It is beyond question that Osborne was not** advancing any cause of the diocese or **engaging in behavior appropriate to the normal scope of employment**.[86]

In comparison, *Patterson* involved an employee who shot out the tires of a vehicle he was attempting to repossess.[87] The Kentucky Supreme Court distinguished this conduct from the circumstances involved in *Wood* and *Osborne* as follows:

> When Blair Jr. went to repossess the truck, Blair Sr. [his father and employer] knew that: (i) his son was looking for the truck, (ii) Patterson would not voluntarily relinquish the truck, and (iii) Patterson had threatened other employees during a failed attempt to repossess the truck.[88]

The *Patterson* Court further noted that "although the act was criminal," Blair Jr.'s conduct clearly advanced the interests of his employer following a pattern of efforts by the company to repossess the vehicle.[89] That Blair Jr. used force to disable the vehicle "was not so outrageous to indicate that the motive was a personal one."[90]

Conversely, in *Hensley*, the Kentucky Court of Appeals found that the employee's conduct did not advance the employer's interests.[91] The facts in *Hensley* show that the store clerk was

---

[85] *Id*.
[86] *Id*. at 915 (emphasis added).
[87] *Patterson*, 172 S.W.3d at 363.
[88] *Patterson*, 172 S.W.2d at 371.
[89] *Patterson*, 172 S.W.3d at 371-72.
[90] *Id*. at 372.
[91] *Hensley v. Traxx Mgmt. Co.*, 622 S.W.3d 652 (Ky. Ct. App. 2020).

confronted by a robber who threatened him with a knife.[92] The robber also threatened to kill the clerk's family if the clerk called the police.[93] The clerk then pursued the robber out of the store and shot and killed him to prevent the robber from following through on the threat against his family.[94] The Court of Appeals remarked that "[deviations] from the employer's business, **no matter how briefly**" suspend the employment relationship.[95] Similar to Prosser and Keeton's rationale on prevention and control, the Court of Appeals held, "Under these circumstances, **Traxx had no ability to prevent [the clerk] from acting as he did**. [The clerk] was not acting within the scope of his employment, and, consequently, as a matter of law, Traxx could not have been found to be vicariously liable for [the clerk's] actions."[96]

Under the facts and issues *sub judice*, the FMCSA must also be considered. Under the FMCSA's zero-tolerance standard, driving while intoxicated is a disqualifying event.[97] To that end, FMCSA requires registered motor carriers to conduct pre-employment drug and alcohol testing, post-hiring random testing, and post-accident testing where there is a fatality.[98] As found by the USDOT auditor, Wooster was compliant with these FMCSA regulations.

Here, this is not a matter of an overzealous employee, Piper, embarking on a misguided venture to advance his employer's interests by unsavory means. This is not a matter of an employee, Piper, committing ordinary negligence by failure to yield, failure to maintain control, or speeding.[99] This is a matter of criminal conduct. The nature, magnitude, and degree of that

---

[92] *Id*. at 654.
[93] *Id*.
[94] *Id*.
[95] *Id*. at 657 (citing 3 C.J.S. Agency, §255) (emphasis added).
[96] *Id*. (emphasis added).
[97] 49 C.F.R. §391.15(c)(2)(a).
[98] 49 CFR §§382.301 (pre-employment testing), 382.305 (random testing), and 382.303 (post-accident).
[99] The Third Restatement acknowledges that certain statutes like speed limits "is compatible with acting in an assigned role to do an assigned task." R.3d of Agency, §7.07, cmt. c. But in the same breath, the Restatement also acknowledges that "the character, **extreme nature**, or other circumstances accompanying an employee's actions may demonstrate" that the employee has stepped outside the scope of employment. *Id*. (emphasis added).

conduct must be measured, and the measure is extraordinary. At the time of the accident, Piper's BAC was 0.25 g/100mL. He caused the death of Colton Tanner and injury to Plaintiffs Almeyda and Felt. A grand jury indicted him on charges of murder, assault, and wanton endangerment. Another jury returned a verdict finding Piper guilty of those charges. For the jury to return a guilty verdict on the charge of murder under the statute, the jury was required to find that Piper "manifest[ed] [an] extreme indifference to human life" and engaged in wanton conduct "which create[d] a grave risk of death[.]"[100]

Piper's conduct was neither of the same general nature nor incidental to his authorized conduct of operating a commercial motor vehicle. Driving while intoxicated disqualified him from commercial driving employment as a matter of law.[101] Unlike *Patterson*, Piper's conduct was unprovoked, highly unusual, and quite outrageous – a jury has already found as much.[102] Like *Wood* and *Osborne*, as Plaintiffs' and Defendant's experts categorically agree,[103] operating a tractor-trailer while intoxicated does not advance Wooster's interests, nor is it behavior appropriate to the normal scope of Piper's employment.[104] Piper's severe intoxication reflects an intentional, criminal, and outrageous course of conduct entirely personally motivated.

Turning back to the roots of the doctrine, those underpinning rationales do not support the imposition of vicarious liability. Piper knew his conduct was both illegal and disqualifying, yet he intentionally chose to consume alcohol and continue driving for personal reasons. There was nothing Wooster could have done to deter Piper's conduct. Liability cannot be imputed simply because he was driving Wooster's tractor-trailer. Under the Restatement, an employee is not acting

---

[100] KRS §507.020(1)(b).

[101] 49 C.F.R. §383.51(b).

[102] *Patterson*, 172 S.W.3d at 371 (citing Prosser and Keaton at 506); *see also* Amended Judgment of Conviction and Sentence after Jury Verdict.

[103] Dep. of Ted. Matthews at p. 104; Dep. of Larry Miller at p. 186.

[104] *Wood*, 194 S.W.2d at 84; *see also Osborne*, 31 S.W.3d at 915.

within the course and scope of employment when the tortious conduct occurs within an independent course of conduct.[105] When he chose to operate a commercial motor vehicle while intoxicated, Piper embarked on an independent course of conduct.

Accordingly, Defendant Wooster respectfully requests entry of summary judgment in its favor on Count I of Plaintiffs' Complaint.

## II. <u>Count II of Plaintiffs' Complaint as to Wooster's Independent and/or Vicarious Liability for Negligence *Per Se* Fails Under the Record as Developed.</u>

Plaintiffs' Complaint alleges Wooster violated multiple "state and federal statutes and regulations, to include but not limited to KRS §189.224, 601 KAR 1:005," and the entire Act of the FMCSA without specifying which regulations Wooster allegedly violated.[106] USDOT auditor, and the parties' experts Messrs. Matthews and Miller all reached the same conclusion: Wooster did not violate any regulation under the FMCSA. Further, Wooster did not authorize Piper's conduct. Thus, Plaintiffs cannot sustain their claim of negligence *per se*.

The Kentucky Supreme Court has held that "negligence *per se* is merely a negligence claim with a statutory standard of care substituted for the common law standard of care."[107] KRS §466.070 makes viable claims arising under statute where the statute does not otherwise confer a private cause of action.[108]

On the one state statute cited by Plaintiffs as applicable to Wooster's conduct and claim of negligence *per se* is KRS §189.224.

---

[105] R.3d of Agency §7.07(2).

[106] *See* Plaintiffs' Complaint at ¶29 (DN 1-2; PageID #9). With respect to the FMCSA, 49 C.F.R. §§350-399, these sections encompass hundreds of regulations. At no time during this proceeding have Plaintiffs attempted to amend their Complaint to provide specificity as to their negligence *per se* claim, and the time for amendments has long since closed.

[107] *Real Estate Mktg. v. Franz*, 885 S.W.2d 921, 927 (internal citation and quotations omitted).

[108] *Id.* (citing *Grayson Fraternal Order of Eagles v. Claywell*, 736 S.W.2d 328 (1987)).

> It is unlawful for the owner, or any other person, employing or otherwise directing the operator of any vehicle, to require or knowingly to permit the operation of such vehicle upon a highway in any manner contrary to law.

As set out in specific detail above regarding claims of vicarious liability, the record is devoid of evidence that Wooster required or knowingly permitted Piper to operate the tractor-trailer while impaired. In fact, as emphasized throughout this Memorandum, both the FMCSA and Wooster's company policy impose a zero-tolerance alcohol standard, and Piper signed acknowledging his understanding as to these policies. Finally, both experts agree that there was nothing about Piper's hiring, retention, or supervision that could have or would have placed Wooster on notice that he would drink while operating Wooster's commercial motor vehicle.[109]

With respect to 601 KAR 1:005, the regulation only adopts certain sections of the FMCSA, not the entirety of the Act.[110] That said, Kentucky state and federal courts "have consistently held that such broad and vague adoption does not create a state law claim for negligence *per se* [under the FMCSA] given the vast and technical nature of the FMCSA."[111] Accordingly, Plaintiffs' claims of negligence *per se* premised upon alleged violations of the entire regulatory scheme FMCSA fail as a matter of law.

Moreover, the USDOT auditor found no violations nor breakdowns in processes in any respect to Wooster's employment of Piper or this accident. The auditor even encouraged Wooster to "keep doing what you're doing."[112] In Mr. Matthews' expert deposition, he could not identify any specific FMCSA regulation he believes Wooster violated. Even if FMCSA violations were actionable under KRS §466.070, the record is devoid of any evidence of any such violations.

---

[109] Dep. of Ted Matthews at p. 105; Dep. of Larry Miller at p. 186.

[110] *See* 601 KAR 1:005, Section 2(1-13) (adopting 49 C.F.R. §§40, 382-385, 390-393, 395-397, and 1572).

[111] *Short. v. Marvin Keller Trucking, Inc.*, 570 F.Supp. 3d 459, 466 (E.D. Ky. 2021) (citing *Infinity Energy, Inc. v. Henson*, No. 2016-CA-518, 2019 Ky. App. Unpub. LEXIS 374 (Ky. Ct. App. May 24, 2019); *Tassin v. BNK Transport, Inc.*, No. 3:19-cv-64-JHM, 2019 U.S. Dist. LEXIS 88525 (W.D. Ky. May 28, 2019)).

[112] *See* USDOT Compliance Audit Report, Exh. D; *see also* USDOT Auditor Email, Exh. E.

Accordingly, Plaintiffs' negligence *per se* claim fails as a matter of law, and Defendant Wooster respectfully moves for entry of summary judgment in its favor on Count II of Plaintiffs' Complaint.

## III. Count III of Plaintiffs' Complaint as to Negligent Hiring, Training, Supervision, And Entrustment Fails Under the Record as Developed.

Plaintiffs' claims of negligent hiring, training, supervision, entrustment and/or retention also fail as a matter of law.[113] Summarizing Kentucky state law, both the Eastern and Western Districts of Kentucky have acknowledged that there are three common elements to claims of negligent hiring, training, supervision, and entrustment: (1) the employer knew or should have known that the employee was unfit for the job; (2) the employee injured the plaintiff; and (3) a causal nexus between the employer's practices and the employee's tortious conduct.[114]

### A. Wooster Properly Hired and Retained Piper Consistent with Federal Regulations.

Kentucky state and federal "courts have generally been unwilling to find that there [are] genuine issues of material fact as to negligent hiring and retention, so long as the employer complied with the hiring practices prescribed by the [FMCSA]."[115]

The FMCSA enumerates the requisite qualifications for employment as a commercial driver, the most pertinent to the issues herein include "by reason of experience, training, or both, [the driver must be able to] safely operate the type of commercial motor vehicle he/she drives,"

---

[113] Count III of Plaintiffs' Complaint is titled "Negligent Hiring, Training, Supervision, and Entrustment" though the allegations thereunder include references to retention. *See* Plaintiffs' Complaint at ¶ 26.

[114] *Short v. Marvin Keller Trucking, Inc.*, 570 F. Supp. 3d 459, 467 fn. 4 (E.D. Ky. 2021) (collecting cases); *M.T. v. Saum*, 3 F. Supp. 3d 617 (W.D. Ky. 2014) (citing *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 733 (Ky. 2009)).

[115] *Gordon v. Turner*, No. 13-136-DLB-CJS, 2016 U.S. Dist. LEXIS 84317, *30 (E.D. Ky. June 29, 2016) (citing *Saum*, 3 F. Supp. 3d at 629 (finding that there was not a genuine issue of material fact as to negligent hiring and retention because the employer obtained a FMCSA screening report, which indicated the employee was qualified to operate a commercial vehicle); *Carberry v. Golden Hawk Transp. Co.*, 402 S.W.3d 556, 563 (Ky. Ct. App. 2013) (reaching the same conclusion based on the fact that the employer complied with all federal motor vehicle regulations before hiring the employee)); *see also Short v. Martin Keller Trucking, Inc.*, 570 F. Supp. 3d 459, 468-69 (E.D. Ky. 2021) (citing *Gordon* in support of the same conclusion).

and be “physically qualified to drive a commercial motor vehicle[.]”[116]

There is no dispute that Piper was older than 21 years of age and fluent in English. By virtue of both experience and training, Piper was capable of safely operating tractor-trailers. He had a history of commercial driving prior to his employment with Wooster.[117] Wooster canvassed his prior motor carrier employers. Under the seven-year lookback period, none of the employers reported any issues as to accident history or drugs and alcohol.[118] The company performed a pre-employment screening program (“PSP”), which included a review of Piper’s 5-year accident history and 3-year roadside inspection history, which was unremarkable.[119] The company submitted a query to the Drug and Alcohol Clearinghouse database, which reported Piper had no violations.[120] Wooster administered a driving road test prior to hiring, which Piper successfully completed.[121] He held a valid commercial driver’s license.[122] At the time of his employment application, Piper held a Medical Examiner’s Certificate valid through May 24, 2024, and renewed by the examiner at that time.[123]

In the matter *sub judice*, just as was true in *Gordon*, *Saum*, *Carberry*, and *Short*, Wooster’s pre-employment hiring and screening practices were compliant with 49 C.F.R. §391.11, as confirmed by the DOT audit.[124] Mr. Matthews further testified he was unaware of “any flaws” in Wooster’s pre-employment hiring practices.[125]

---

[116] 49 CFR §391.11 (other requisite qualifications include being at least 21 years old, fluent in English, hold a valid commercial motor vehicle driver’s license, and successfully complete a road test or equivalent.).

[117] *See* Piper Transportation Employment History, attached hereto as Exh. M. p. 117 – 120

[118] Dep. of Ted Matthews at p. 41-42; *see also* Dep. of Larry Miller at p. 136-137.

[119] *See* MVR Express Report, attached hereto as Exh. N.

[120] *See* Clearinghouse Query Report, attached hereto as Exh. O.

[121] *See* Wooster Driver Road Test, attached hereto as Exh. P.

[122] *See* HireRight License Verification, attached hereto as Exh. Q.

[123] *See* May 2022 Medical Examiner’s Certificate, Exh. H.

[124] *See* USDOT Audit Report, Exh. D.

[125] Dep. of Ted Matthews at p. 46-47.

With respect to foreseeability, neither Piper's prior motor carrier employers nor the federal Clearinghouse database included any reports or violations involving drugs or alcohol. As shown, the FMCSA empowers motor carriers to conduct a range of pre-hire investigations, all of which Wooster completed. Even Plaintiffs' own expert agrees that nothing about Wooster's pre-employment practices gave the company any reason to know or even suspect that Piper would operate a commercial motor vehicle while intoxicated.[126]

The record as developed does not support Plaintiffs' claim of negligent hiring. Accordingly, it fails as a matter of law, and Defendant Wooster respectfully requests entry of summary judgment on Count __ of Plaintiffs' Complaint.

B. Wooster Properly Trained and Supervised Piper Consistent with Federal Regulations.

Upon extending an offer of employment, Wooster provided Piper with several documents relating to the FMCSA, company policies and procedures, and safety.

Wooster provided Piper a list of "Key Operating Points," which emphasized, *inter alia*, safety and the exercise of critical thinking and expertise in the safe operation of motor vehicles.[127] Piper initialed each point and signed as evidence of his receipt and acknowledgement. Wooster provided him with a number of materials, each of which Piper signed his understanding and acknowledgement: Wooster's Driver's Manual,[128] its Drug and Alcohol Policy,[129] its Drug Free Workplace Program Policy,[130] its policies as to dash cameras and use of company vehicles for personal conveyance,[131] and an FMCSA Pocketbook[132]

---

[126] Dep. of Ted Matthews at p. 105 ("…nothing in [Piper's] file that … would be an indicator that [he] would drive while intoxicated.").

[127] *See* Key Operating Points, attached hereto as Exh. R.

[128] *See* WMW Drivers Manual Receipt, attached hereto as Exh. S.

[129] *See* Drug and Alcohol Policy Acknowledgment of Receipt, Exh. J.

[130] *See* Drug Free Workplace Program Policy Acknowledgment of Receipt, Exh. K.

[131] *See* Commercial Vehicle Camera Policy and Personal Conveyance Policies, attached hereto as Exh. T.

[132] *See* Driver FMCSA Pocketbook Receipt, attached hereto as Exh. U.

In May 2024, Piper underwent another medical examination to renew his medical certificate.[133] In a questionnaire therein, he reported consuming alcohol "[o]ccasionally on the weekend[.]"[134] The medical examiner was a DOT-registered physician.[135] In his May 2024 examination, the medical examiner did not note any concerns about his alcohol use.[136] Not only was Wooster entitled to rely upon the medical examiner's expertise and assessment, nothing under the FMCSA authorized the company to dispute the certification.[137] Further, Messrs. Matthews and Miller concur on this point.

The Court of Appeals' analysis in *Carberry* is also instructive on Plaintiffs' claim of negligent training and supervision.[138] There, the commercial driver made a detour while on dispatch, during which his girlfriend was a passenger in the tractor-trailer.[139] While meeting with the girlfriend's ex-husband, the driver assaulted the ex-husband.[140] The motor carrier's pre-employment background checks did not identify any propensity for violence.[141] Further, the driver signed an acknowledgement form for the motor carrier's policy against passengers.[142]

In affirming summary judgment, the Court of Appeals remarked that "strict polic[ies] prohibiting passengers would not have ensured [the driver's] compliance" as he engaged in an intentional course of conduct beyond the company's control.[143] It further held:

---

[133] *See* May 2024 Medical Examination Certificate, Exh. H.
[134] *Id.* at p. 1 (May 2024 Med Exam).
[135] 49 C.F.R. §391.43(a). Further, Appendix A to Part 391 – Medical Advisory Criteria – guides and empowers medical examiners to document observations of signs of alcoholism, and it further authorizes additional assessments. *See* 49 C.F.R. Part 391 Appendix A, Subsection K, Medical Advisory Criteria for 49 C.F.R. §391.41(b)(13).
[136] May 2024 Medical Examination Certification, Exh. H. at p. 3-4.
[137] 49 C.F.R. §391.47 (discussing procedure for resolving conflicts of medical examinations where "there is a disagreement between the medical examiner for the driver and the medical examiner for the motor carrier[.]").
[138] *Carberry v. Golden Hawk Transp. Co.*, 402 S.W.3d 556 (Ky. Ct. App. 2013).
[139] *Id.* at 558.
[140] *Id.*
[141] *Id.*
[142] *Id.* at 564.
[143] *Id.*

> [T]he trial court found [the motor carrier] had no reason to suspect [the driver] would commit an assault while on the job and went on to find [the driver] **acted so outside the normal scope of employment that no reasonable amount of training or supervision could have prevented the attack**. On the facts presented, we agree. … We see no basis upon which [the plaintiff] could succeed on a claim of negligent training and supervision.[144]

Wooster's pre-employment investigations did not yield any indicia of evidence that Piper had a propensity for driving while intoxication. A registered medical examiner did not have any concerns. In his tenure of employment, he never gave any hint that he might someday operate a motor vehicle while intoxicated. No one at Wooster ever had any reasonable suspicion to require Piper to submit for reasonable suspicion testing. Piper's intoxication on the day of the accident was wholly unforeseeable. Messrs. Matthews and Miller agree that nothing about Piper indicated he would drive a commercial motor vehicle while intoxicated.[145]

Conversely, Piper knew of the zero-tolerance policies under the FMCSA and Wooster policy. He knew of Wooster's random and reasonable suspicion testing programs for drugs and alcohol. He knew it was not only disqualifying but also a crime to operate Wooster's commercial motor vehicles while intoxicated. Regardless, he engaged in an intentional course of conduct so outrageous and beyond regulatory and company standards that no reasonable amount of training or supervision could have prevented his actions of drinking and driving on the date of this accident.

Plaintiffs' claim of negligent training and supervision fails as a matter of law, and Defendant Wooster respectfully moves for entry of summary judgment on Count III of Plaintiffs' Complaint.

## IV. Plaintiffs' Allegations of Gross or Reckless Negligence Woven Throughout the Entirety of their Complaint and Set Forth in Their Prayer for Relief Requesting Punitive Damages Against Wooster, Independently or Vicariously, Fail as a Matter of Law.

---

[144] *Id*. (internal quotations omitted).
[145] Dep. of Ted Matthews at p. 105; Dep. of Larry Miller at p. 186-187.

On its face, Plaintiffs' Complaint asserts vicarious and independent claims of gross negligence against Defendant Wooster.[146] The record as developed does not support an award of punitive damages against Wooster on either a vicarious or independent basis of liability.

"[Punitive damages] are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence."[147] Claims for punitive damages under Kentucky law are authorized and limited by KRS §411.184, which provides in relevant part:

> (2) A plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud, or malice.
> (3) In no case shall punitive damages be assessed against a principal or employer for the act of an agent or employee unless such principal or employer authorized or ratified or should have anticipated the conduct in question.

According to the Western District of Kentucky: "Kentucky is the only state with a statute that so broadly limits vicarious liability for punitive damages[.]"[148] Kentucky federal and state courts interpret the statute to require: (1) authorization by the employer, in the sense of "pre-approval of the conduct[,]" (2) anticipation by the employer, or (3) ratification by the employer, in the sense of "after the fact approval of the conduct[.]"[149]

Prior DOT employment and license history inquiries – limited to three years per the FMCSA[150] – did not show any history or proclivity for driving while intoxicated.[151] Piper's pre-

---

[146] The construction of Count I – Common Law Negligence suggests Wooster's liability thereunder is limited to vicarious liability. *See* Plaintiffs' Complaint at ¶¶ 9- 17 (DN 1-2; PageID #7-8). In contrast, the construction of Counts II – Negligence *Per Se* and Count III – Negligent Hiring, Training, Supervision, and Entrustment include allegations of direct liability. *See id.* at ¶¶ 18-33. In each Count, Plaintiffs allege either gross negligence or characterize the Defendants' alleged negligence as "careless and reckless."

[147] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S. Ct. 2997, 3012 (1974).

[148] *Saum*, 3 F. Supp. 3d at 627 (citing *Berrier v. Bizer*, 57 S.W.3d 271, 283 (Ky. 2001)).

[149] *Ball v. Lab. Corp. of Am.*, No. 3:22-cv-184-RGJ, 2023 U.S. Dist. LEXIS 197471, at *9-10 (W.D. Ky. Nov. 1, 2023) (citing *Saint Joseph Healthcare, Inc. v. Thomas*, 487 S.W.3d 864, 870 (Ky. 2016); *Univ. Med. Ctr., Inc. v. Beglin*, 375 S.W.3d 783, 793-94 (Ky. 2011)).

[150] 49 C.F.R. §391.23.

[151] *See* Piper Transportation Employment History, Exh. M.

employment testing was negative. While Piper was never selected for random testing, those tests were administered by a third-party and Wooster had no ability to influence who it selected.[152] Nothing in the record suggests Wooster had cause for reasonable suspicion drug and alcohol testing at any time during his employment.

The record is devoid of any evidence to support a finding that Wooster knew or should have known that Piper had a tendency or proclivity to drive while intoxicated – much less that it knew or should have known he was intoxicated at the time of the accident sufficient that Wooster could have taken preventative measures.[153] On this, Mr. Matthews testified:

> **Mr. Matthews:** **Nothing in [Wooster's] files that [were] presented here would be an indicator that [Piper] would drive while intoxicated[.][154]**

Moreover, it is indisputable that Wooster did not authorize or ratify Piper's conduct. Accordingly, Wooster is not vicariously liable for any punitive damages assessed against Piper for his gross negligence. Similarly, Wooster's employment practices were compliant with FMCSA regulations. The USDOT auditor identified no violations or breakdowns in processes. Plaintiffs' own expert found no flaws in Wooster's corporate records. Piper's outrageous, criminal, intentional course of conduct was unforeseeable, and no amount of training or supervision could have prevented this accident.[155]

Accordingly, Plaintiffs' claims of gross negligence against Wooster, directly and/or vicariously, fail as a matter of law, and Defendant Wooster respectfully moves for entry of summary judgment.

---

[152] Dep. of Ted Matthews at p. 72; Dep. of Larry Miller at p. 142-143.

[153] Dep. of Ted Matthews at p. 105; Dep. of Larry Miller at p. 186.

[154] Dep. of Ted Matthews at p. 105.

[155] *Carberry*, 402 S.W.3d at 564.

## **SUMMATION**

For all the foregoing reasons and arguments herein, not one count of Plaintiffs' Complaint survives. Defendant, Wooster Motor Ways, Inc., respectfully moves for entry of an Order granting summary judgment on all counts and dismissing Defendant Wooster from this action with prejudice.

Respectfully submitted,

*/s/ Christina R.L. Norris*

Christina R.L. Norris
Cash C. Collins
Dinsmore & Shohl LLP
101 S Fifth St., Suite 2500
Louisville, KY 40202
Phone: (502) 581-8000
Fax: (502) 585-2207
Christina.Norris@dinsmore.com
Cash.Collins@dinsmore.com
*Counsel for Defendant*
*Wooster Motor Ways, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on November 3rd, 2026, I electronically filed this document through the ECF system, I served this document through electronic mail or USPS as notated upon the following:

Adrian Mendiondo
Shea Conley
Morgan & Morgan, Kentucky, PLLC
333 West Vine St., Suite 1200
Lexington, KY 40507
amendiondo@forthepeople.com
sconley@forthepeople.com
*Counsel for Plaintiffs*

**And sent a copy via USPS to:**
Richard E. Piper
Louisville Metro Department of Corrections
400 S. 6th Street
Louisville, KY 40202
Inmate#656299
*Pro se*

***/s/ Christina R.L. Norris***
*Counsel for Defendant,*
*Wooster Motor Ways, Inc.*